IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs November 4, 2025

**TARVIS WEATHERLY v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 17-01447/C1702178    Jennifer Johnson Mitchell, Judge**

_____

**No. W2025-00489-CCA-R3-PC**
_____

The petitioner, Tarvis Weatherly, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received the effective assistance of counsel. After our review of the record, briefs, and applicable law, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and STEVEN W. SWORD, JJ., joined.

Rosalind Elizabeth Brown, Memphis, Tennessee, for the appellant, Tarvis Weatherly.

Jonathan Skrmetti, Attorney General and Reporter; Ryan Dugan, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Vicki Carriker and Russell Born, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

On direct appeal, this Court summarized the facts surrounding the petitioner's conviction for aggravated sexual battery, as follows:

> A Shelby County grand jury indicted the [petitioner] for one count of aggravated sexual battery committed against his nine-year-old victim, T.C.[1]

---

[1] It is the policy of this Court to refer to minor victims and their family members by initials only. Therefore, the victim will be referred to as "the victim" or "T.C." and the victim's grandmother will be referred to as "S.C."

Tenn. Code Ann. § 39- 13-504(a)(4). The crime occurred on June 2, 2016, while the victim was spending the night at the home of her stepfather. At the time, the victim's stepfather lived with his cousin, "Red," who is also the victim's aunt. Red's boyfriend, the [petitioner], also lived in the home. That day, the victim's grandmother, S.C., dropped off the victim and her younger brother at their stepfather's home. Though their stepfather was not there, Red and the [petitioner] were home, and Red agreed to watch the children. The victim recalled the [petitioner] and Red were drinking beer before she fell asleep on the couch. The victim woke as the [petitioner] carried her to her stepfather's bedroom and placed her in the bed with her brother. The victim went back to sleep but later woke to the [petitioner] touching her "pie pie," or vagina, with his finger over her clothes. The victim told the [petitioner] to stop, and the [petitioner] exited the room "super-fast." The victim began to cry though her brother remained asleep, and the [petitioner] returned, turned on the lights, and asked the victim what was wrong. The [petitioner] then exited the bedroom, and the victim attempted to go back to sleep. The victim explained this pattern continued throughout the night "like three more times" during which the [petitioner] also touched her buttocks "[l]ike once." As the abuse continued, the victim moved to a different area of the bed and at one point, confronted the [petitioner], stating, "you touching me," but the [petitioner] denied doing so. Though the victim did not recall how long the abuse lasted, she explained the [petitioner] entered and exited the room "[a]t least four or five times," touching her each time. In photographs entered into evidence, the victim identified the bed where she slept with her brother and where she, her brother, and the [petitioner] were positioned during the night.

The next morning, Red asked the victim why she was upset, and though the victim initially stated nothing was wrong, the victim eventually disclosed that the [petitioner] touched her. As a result, Red contacted S.C. who came to the house followed by the police. The victim disclosed what happened to both her grandmother and the police. She subsequently participated in an examination at the Memphis Rape Crisis Center and a forensic interview at the Memphis Child Advocacy Center. A recording of the forensic interview was entered into evidence.

S.C. testified she received a telephone call from the victim's stepfather on the morning of June 2, 2016. He told S.C. that the [petitioner] had touched the victim and asked S.C. to pick up the victim from his home. As a result, S.C. called the police and drove to the victim's stepfather's home, noting the police arrived approximately five minutes after she did. While on the scene, S.C. saw the [petitioner] though she did not interact with him, the

victim disclosed to her what happened, and S.C. spoke with police. S.C. then took the victim to the Memphis Rape Crisis Center for an examination after which she also took the victim to be examined by a doctor. Several weeks later, S.C. took the victim to the Memphis Child Advocacy Center for a forensic interview.

Memphis Police Department (MPD) Officer Chris Murphy responded to the scene where he spoke with the [petitioner] and S.C., noting S.C. made the initial call to law enforcement. After conducting a preliminary investigation, Officer Murphy contacted the Sex Crimes Unit who took over the investigation. In doing so, MPD Officer Margaret Houston reviewed the victim's forensic interview and obtained approval for indictment of the [petitioner].

Sally Discenza, an expert in sexual assault in forensic examinations, performed a physical examination of the victim at the Memphis Rape Crisis Center on June 2, 2016. Ms. Discenza obtained a history of the incident from the victim wherein the victim explained the [petitioner] touched her "pie" over her clothes. The victim pointed to her vaginal area in order to clarify where the [petitioner] touched her. The victim continued, stating she told the [petitioner] to stop and that she would tell Red what the [petitioner] did. The victim disclosed, however, that the [petitioner] again touched her vaginal area and buttocks over her clothes. The victim began crying, and the [petitioner] asked her what was wrong. The victim told the [petitioner], "you were feeling on me." Red heard the victim crying and asked if the [petitioner] touched the victim, and the victim told Red that the [petitioner] touched her. According to Ms. Discenza, the victim denied that the [petitioner] touched her under her clothes or that the [petitioner] had touched her prior to this incident. Based upon this information, Ms. Discenza did not obtain a sexual assault kit and noted she did not expect any injury to the victim. Ms. Discenza described the victim as cooperative, quiet, and "uncomfortable when she was talking about the specifics of the sexual assault."

Teresa Onry of the Memphis Child Advocacy Center performed the forensic interview of the victim on July 14, 2016, which was played for the jury during trial. During the interview, the victim stated the [petitioner] touched her "pie pie." According to Ms. Onry, in describing the [petitioner's] actions, the victim pointed to her vagina and "did kind of like a rubbing motion."

- 3 -

The State rested its case, and the trial court denied the [petitioner's] motion for judgment of acquittal. The [petitioner] then testified on his own behalf.

The [petitioner] explained he lived with Red at her home on June 2, 2016. That evening, the [petitioner] drank beer with his friends before helping put the children to bed at approximately 11 p.m. or 12 a.m. The [petitioner] explained he planned to sleep on the couch and the children were to sleep in the stepfather's bedroom. As such, the [petitioner] picked up the victim and carried her to the bedroom, noting he bumped the victim's head and almost dropped her on the way but she did not wake. The [petitioner] placed the victim in the bed and Red placed the victim's brother in the bed. Before leaving the bedroom, the [petitioner] checked the victim's head for an injury but did not notice anything significant.

Around 3:00 or 4:00 a.m. while the [petitioner] was asleep on the couch, he saw the victim enter the living room and attempt to wake Red. When Red did not wake, the victim approached the [petitioner], and he asked the victim what was wrong. The victim indicated she wanted to sleep with Red but the [petitioner] told her to go back and sleep with her brother. In response, the victim said, "you ain't want us over here no way" followed by, "I'm going to tell [] Red you touched me." The victim then returned to the bedroom. After considering what the victim said, the [petitioner] went to the bedroom and confronted her, stating "I know I heard what you said, you said you going to tell [] Red I touched you." The victim denied making the statement, and the [petitioner] told the victim to "sit [her] butt in that bed" and stay there or he would "beat [her] butt." The [petitioner] then went back to sleep.

At approximately 7:00 a.m., Red woke the [petitioner], stating the victim claimed he touched her. The [petitioner] denied touching the victim but asked the victim where he touched her. The victim stated, "you touched me on my booty pie" and indicated he touched the left side of her "booty." The [petitioner] asked where else he touched the victim, and she stated "nowhere else." The [petitioner] asked the victim if he touched her with his hand or finger, and the victim stated the [petitioner] used his finger. In response, the [petitioner] told Red to contact the victim's stepfather.

The [petitioner] then went to work before receiving a phone call from his cousin around 2:00 p.m. The [petitioner's] cousin indicated S.C. was at the home because the victim claimed the [petitioner] touched her. The

- 4 -

[petitioner] told his cousin what happened and stated he would be home in about thirty minutes to an hour. He also asked that S.C. leave her phone number and take the victim to the hospital if he did not return home before they left. When the [petitioner] returned home around 4:00 or 5:00 p.m., he continued to deny touching the victim. S.C. also returned, and the [petitioner] stated she was carrying a baseball bat and was accompanied by "some more guys." According to the [petitioner], a neighbor warned him one of the men with S.C. had a gun. The [petitioner] stated he was not armed. S.C. then accused the [petitioner] of touching the victim. The [petitioner] claimed the victim was lying and denied the allegations. According to the [petitioner], S.C. "wanted to get aggressive," so he suggested they contact the police. S.C., however, wanted to "handle it" herself and began arguing with Red. According to the [petitioner], Red threw a chair at S.C., and S.C. "came at [Red] with the bat." As a result, the [petitioner] called 9-1-1 around 6:00 p.m., and the police arrived around 6:15 or 6:30 p.m. The men who came with S.C. left when the police arrived. The [petitioner] noted he did not see a gun on the men. The [petitioner] denied the victim's allegations to the responding officers but cooperated with the investigation.

During cross-examination, the [petitioner] stated that as he carried the victim to bed, she tried to wrap her legs around him. The [petitioner] moved her legs together, and the victim did not wake. After hitting the victim's head "pretty hard" against the wall and almost dropping her, the [petitioner] stated the victim started snoring but again, did not wake. The [petitioner] explained he likely bumped the victim's head against the wall because he "was off balance" from drinking. After placing the victim in the bed, the [petitioner] checked her head for knots while both Red and the victim's brother were in the room.

The [petitioner] continued, explaining the victim entered the living room around 3:00 or 4:00 a.m. because she wanted to sleep with Red. When Red did not wake up, the [petitioner] sent the victim back to the bedroom. In response, the victim told the [petitioner] she would tell Red that the [petitioner] touched her. The [petitioner] soon confronted the victim about her statement and told her he would "beat [her] butt" if she got up again. The [petitioner] did not think to check the victim's head for an injury at that time as it had "slipped my mind that I even had bumped her head." The [petitioner] stated the victim's brother did not wake up during their interaction.

The [petitioner] further stated he was detained on the scene and later provided a statement to police after being advised of his rights. The

- 5 -

[petitioner] confirmed his trial testimony mirrored the statement provided to law enforcement, including that he told police he bumped the victim's head and checked it before putting her to bed, the victim told him she would tell Red that he touched her, and he made the 9-1-1 call that prompted a police response. The [petitioner], however, could not recall if he told police that S.C. had a baseball bat while at the home. He also stated he did not tell police that he saw a gun on the men who were with S.C. because the police did not ask. The [petitioner] could not recall if the police asked him if he was ever alone with the victim. The [petitioner] also admitted to numerous prior felony convictions which included several aggravated robberies and theft of property.

Finally, the State presented rebuttal proof from MPD Sergeant Donald Cummings who interviewed the [petitioner] on June 2, 2016. After the [petitioner] waived his *Miranda* rights, Sergeant Cummings took a statement from the [petitioner]. Sergeant Cummings pointed out that within the statement, the [petitioner] did not indicate that he bumped the victim's head while carrying her, that he checked the victim's head for blood while in the bedroom, that the victim entered the living room wanting to sleep with Red, that the victim stated she would tell Red the [petitioner] touched her, that the [petitioner] told the victim he would beat her butt if she got out of bed again, that S.C. confronted him with a baseball bat, or that the two men who accompanied S.C. were armed with a gun on the day after the incident. Sergeant Cummings also noted he twice asked the [petitioner] if he had been alone with the victim which the [petitioner] denied. Sergeant Cummings acknowledged the [petitioner's] statement was given over three years ago during which the [petitioner] denied touching the victim.

At the close of proof, the [petitioner] renewed his motion for a judgment of acquittal which was denied by the trial court, and the jury returned a verdict of guilty for aggravated sexual battery, as charged. The trial court sentenced the [petitioner] to thirty years in the Tennessee Department of Correction and denied his motion for a new trial.

*State v. Weatherly*, No. W2019-02136-CCA-R3-CD, 2020 WL 7040653, at *1-4 (Tenn. Crim. App. Nov. 30, 2020), *perm. app. denied (Tenn. Mar. 23, 2021).*

Following the denial of his direct appeal, the petitioner filed a timely pro se petition for post-conviction relief.[2]  Following the appointment of counsel, the petitioner filed an

---

[2] The petitioner's pro se petition for post-conviction relief is not included in the record.

amended petition for post-conviction relief, arguing, in part, that trial counsel was ineffective for failing to pursue a defense on the petitioner's behalf and failing to prepare the petitioner for trial.

An evidentiary hearing was held on December 18, 2023, during which the petitioner testified that trial counsel was appointed to represent him after he was indicted in criminal court. The petitioner asked trial counsel to hire an investigator to obtain video surveillance from nearby businesses. However, trial counsel told the petitioner that the businesses would be unwilling to provide them with the surveillance footage. Although the petitioner agreed that any surveillance video would not show what occurred inside of his residence on the night of the incident, he claimed it would prove that the victim's grandmother lied under oath about her interactions with the petitioner. The petitioner also believed an investigator could have explored the victim's family's credibility based on their drug and alcohol use.

The petitioner testified that he was in jail for 910 days awaiting trial, and, during that time, three different judges handled his case. The petitioner requested trial counsel file a motion for speedy trial; however, trial counsel refused to do so. Because of the delay in getting the petitioner's trial set, two important witnesses, Alicia "Red" Farmer and Olivia Parker, became unavailable. The petitioner claimed Ms. Farmer, his former girlfriend and the victim's aunt, was in the petitioner's house at the time of the incident but was unable to testify at trial because the petitioner's cousin "moved [her] into [a] new house." The petitioner's cousin told the petitioner that Ms. Farmer "stay[ed] drunk and on drugs too much" to testify. Additionally, Ms. Parker, the petitioner's seventy-year-old neighbor, witnessed an altercation between the petitioner and the victim's grandmother, during which the victim's grandmother threatened the petitioner with a bat.

Regarding trial counsel's cross-examination of witnesses, the petitioner testified that trial counsel's questions during cross-examination were "almost similar to what the prosecutor was asking." However, when the victim's grandmother made inconsistent statements during cross-examination, trial counsel did not point them out or ask further questions. The petitioner stated that he knew Sergeant Cummings, who testified as a rebuttal witness at trial, because Sergeant Cummings had previously investigated the petitioner when Ms. Farmer accused the petitioner of touching another of her nieces. According to the petitioner, that case was later dismissed. However, trial counsel failed to question Sergeant Cummings regarding this connection.

The petitioner also testified that, during his sentencing hearing, his prior offenses were erroneously used to place him in a higher sentencing bracket, making him a career offender. On cross-examination, the petitioner argued his prior convictions should have

merged under the twenty-four-hour merger rule, which would have placed him in the persistent offender range instead of the career offender range.

During a second evidentiary hearing on February 29, 2024, trial counsel testified that she was appointed to represent the petitioner on an aggravated sexual battery charge. Trial counsel frequently met with the petitioner to discuss his case, including potential plea offers from the State and witnesses the petitioner wanted trial counsel to investigate. Trial counsel also assigned an investigator to assist her in preparing for trial. The investigator attempted to locate Ms. Farmer multiple times. However, Ms. Farmer did not return the investigator's phone calls and avoided all attempts at communication. On cross-examination, trial counsel testified that her investigator did not speak to the petitioner. Instead, trial counsel would get any pertinent information from the petitioner and pass it along to the investigator. Trial counsel denied knowing about any "bad blood between [the petitioner] and the [victim's] parents." Although trial counsel recalled "something about" the victim and her brother not being welcome at the petitioner's house, she thought it was "worked out" by the time of the incident. Trial counsel testified that she was not aware of the previous incident where Ms. Farmer accused the petitioner of sexually abusing a different niece. Trial counsel also did not recall the petitioner telling her about surveillance cameras at a church across the street from his house or asking her to retrieve the footage. On redirect examination, trial counsel agreed that the State also attempted to locate Ms. Farmer because she was the first person the victim told of the abuse, and therefore, trial counsel would have been hesitant to use her at trial even if she had been located.

Trial counsel recalled Sergeant Cummings testifying at trial but stated that her main concern during his testimony was the petitioner's sex offender status inadvertently being revealed. Trial counsel also testified that she did not recall asking the victim's grandmother about an incident where she threatened the petitioner but stated that it sounded familiar.

Trial counsel reset the petitioner's case three times, twice for the petitioner to undergo mental evaluations and once for the petitioner to consider an offer from the State. Because trial counsel believed there was a high likelihood of conviction if the case went to trial, trial counsel "spen[t] a lot of time trying to get [the petitioner] to plead to [the State's] offer," even bringing the petitioner's family members in to speak with him. However, the petitioner was adamant about going to trial. On cross-examination, trial counsel testified that the petitioner did not complain about his extended pre-trial incarceration. Trial counsel stated that she was "not going to just hurry up and go to trial if [she did not] think that [the petitioner] thoroughly [understood] the ramifications of [the punishment and allegations]."

Trial counsel agreed the petitioner was a career offender and testified that he had at least ten prior crimes of violence as well as a theft conviction. Additionally, at the time of the petitioner's arrest in this case, the petitioner was a registered sex offender.

After its review of the evidence presented, the post-conviction court denied relief, and this timely appeal followed.

## *Analysis*

On appeal, the petitioner argues trial counsel was ineffective for failing to prepare the petitioner for trial, failing to pursue a defense, and failing to argue for a lower range at sentencing. The State contends the post-conviction court properly denied relief.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a presumption of correctness only to the post-conviction court's findings of fact. *Id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id.* Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.*; *see*

*also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

## I.      Failure to Pursue a Defense/Prepare for Trial[3]

In related claims, the petitioner argues trial counsel was ineffective for failing to pursue a defense and failing to prepare the petitioner for trial. Specifically, the petitioner contends trial counsel failed to adequately locate and investigate witnesses and retrieve surveillance video footage. He argues that trial counsel's failure to properly investigate the case resulted in the inadequate cross-examination of the victim's grandmother and Sergeant Cummings. The petitioner also contends that trial counsel failed to pursue a motion for speedy trial. The State submits trial counsel was not ineffective in preparing for trial and pursuing a defense.

## A.      Lack of Investigation

At the evidentiary hearing, the petitioner testified that he asked trial counsel to hire an investigator, but she did not do so. The petitioner specifically wanted an investigator to retrieve video surveillance footage from nearby businesses to prove that the victim's grandmother lied under oath about confronting the petitioner. He also wanted the background of the victim's family to be investigated. The petitioner believed their drug and alcohol abuse could be used to attack their credibility. Trial counsel testified that she used an investigator in this case; however, her investigator did not speak directly with the petitioner. Instead, trial counsel would gather information from the petitioner and consult

---

[3] For the sake of clarity, we have reordered and renumbered the issues from the order they appeared in the petitioner's brief.

with the investigator. The investigator attempted to locate the petitioner's ex-girlfriend, Ms. Farmer, who was inside the residence at the time of the incident. However, Ms. Farmer evaded the investigator's attempts and refused to return phone calls. Trial counsel denied being informed concerning any "bad blood" between the petitioner and the victim's family. Additionally, trial counsel did not recall the petitioner telling her about a previous incident where Ms. Farmer accused the petitioner of abusing a different niece or about surveillance camera footage from the church across the street from the petitioner's house. On redirect examination, trial counsel testified that, even if Ms. Farmer had been located, trial counsel would have been reluctant to put her on the stand because she was the first person the victim told of the abuse.

Although the petitioner argues that trial counsel should have interviewed and investigated potential witnesses and secured video surveillance footage prior to trial, he failed to present any witnesses or video footage at the evidentiary hearing or state what information further investigation would have revealed or how it would have altered the outcome of the trial and, therefore, cannot establish prejudice. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Furthermore, the post-conviction court implicitly accredited the testimony of trial counsel, and nothing in the record preponderates against its findings. *See Tidwell*, 922 S.W.2d at 500.

## B.    Cross-Examination of the Victim's Grandmother and Sergeant Cummings

At the evidentiary hearing, the petitioner testified that, although trial counsel cross-examined the victim's grandmother and Sergeant Cummings, she asked questions that were "similar to what the prosecutor was asking." The petitioner stated that trial counsel did not point out the victim's grandmother's inconsistent statements or ask any questions about Sergeant Cummings' prior experience with the petitioner. Although trial counsel recalled Sergeant Cummings and the victim's grandmother testifying at trial, she was mostly concerned with the petitioner's sex offender status being revealed during Sergeant Cummings' testimony and did not recall asking the victim's grandmother about an incident where she threatened the petitioner.

The decision of whether to cross-examine a witness, as well as what matters to inquire into on cross-examination, is a "strategic[] or tactical choice, if informed and based on adequate preparation." *Pierce v. State*, No. M2005-02565-CCA-R3-PC, 2007 WL 189392, at *7 (Tenn. Crim. App. Jan. 23, 2007) (citations omitted), *no perm. app. filed*. A petitioner alleging the ineffective assistance of counsel based on cross-examination decisions must show "what additional beneficial evidence could have been elicited" through additional cross-examination and must present that witness at the evidentiary hearing to demonstrate how that witness would have responded. *See Ortiz v. State*, No. M2020-01642-CCA-R3-PC, 2021 WL 5080514, at *4 (Tenn. Crim. App. Nov. 2, 2021),

*perm. app. denied* (Tenn. Jan. 14, 2022). The petitioner cannot show prejudice when he failed to present either the victim's grandmother or Sergeant Cummings at the evidentiary hearing to show what trial counsel could have elicited through cross-examination. The petitioner is not entitled to relief on this issue.

## C.      Motion for Speedy Trial

At the evidentiary hearing, the petitioner testified that he was in jail for 910 days awaiting trial, during which time three different judges handled his case. The petitioner requested that trial counsel file a motion for speedy trial; however, trial counsel refused to do so. Because of the delay in taking his case to trial, the petitioner claimed two witnesses, Ms. Farmer and Ms. Parker, became unavailable. According to the petitioner, prior to trial, Ms. Farmer moved in with the petitioner's cousin, who told the petitioner that Ms. Farmer could not testify because she "stay[ed] drunk and on drugs too much." The petitioner also claimed that Ms. Parker, the petitioner's elderly neighbor, witnessed an altercation between the petitioner and the victim's grandmother.

Trial counsel testified that she reset the petitioner's case three times, twice to allow the petitioner to undergo a mental evaluation and once to give the petitioner more time to consider an offer from the State. Trial counsel believed there was a high probability of conviction if the petitioner went to trial, so she "spen[t] a lot of time trying to get [the petitioner] to plead to [the State's] offer." On cross-examination, trial counsel testified that the petitioner did not complain about his pre-trial incarceration. Therefore, she was "not going to just hurry up and go to trial if [she did not] think that [the petitioner] thoroughly [understood] the ramifications of [the punishment and allegations]."

As noted above, trial counsel's testimony indicates she made a strategic and informed decision to request three continuances to allow the petitioner to undergo mental evaluations and consider offers from the State. Trial counsel believed these continuances were necessary due to the high likelihood of conviction if the case went to trial. The post-conviction court implicitly accredited the testimony of trial counsel, and nothing in the record preponderates against the findings of the post-conviction court. *See Tidwell*, 922 S.W.2d at 500. In addition, the fact that a strategy or tactic failed or was detrimental to the defense does not, alone, support a claim for ineffective assistance of counsel. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is given to sound tactical decisions made after adequate preparation for the case. *Id.* Moreover, the petitioner failed to present either Ms. Farmer or Ms. Parker at the evidentiary hearing and, therefore, cannot establish prejudice. *See Black*, 794 S.W.2d at 757-58. The petitioner is not entitled to relief on this issue.

## II.      Failure to Argue for Lower Sentencing Range

The petitioner submits trial counsel was ineffective for failing to argue for a lower range at the petitioner's sentencing hearing. Specifically, the petitioner contends the twenty-four-hour merger rule should have applied to his prior convictions, placing him in a lower sentencing range. Trial counsel's failure to "make the proper arguments at the sentencing phase [led] to [the p]etitioner receiving an improper sentence." The State contends trial counsel was not ineffective for failing to argue for a lower sentencing range.

We note that the petitioner was convicted of aggravated sexual battery, a Class B felony. *Weatherly*, 2020 WL 7040653, at *1. He was sentenced as a Range IV, career offender and received a sentence of thirty years at 100%. As relevant here, a Range IV, career offender is defined as a defendant who has received "[a]ny combination of six (6) or more Class A, B or C felony convictions, and the defendant's conviction offense is a Class A, B or C felony[.]" Tenn. Code Ann. § 40-35-108(a)(1). Therefore, for the petitioner to have qualified as a Range IV offender, he must have had any combination of six or more Class A, B, or C felonies. The statute further provides that "[e]xcept for convictions for which the statutory elements include serious bodily injury, threatened serious bodily injury or threatened bodily injury to the victim or victims . . . , convictions for multiple felonies committed within the same twenty-four-hour period constitute one (1) conviction for the purpose of determining prior convictions." *Id.* at § 40-35-108(b)(4). "This is commonly known as the twenty-four-hour merger rule." *State v. Jordan*, No. M2016-01067-CCA-R3-CD, 2017 WL 2782204, at *3 (Tenn. Crim. App. June 27, 2017), *no perm. app. filed*.

At the evidentiary hearing, the petitioner testified that his prior convictions should have merged under the twenty-four-hour merger rule, which would have placed him in the persistent offender range instead of the career offender range. Trial counsel testified that the petitioner was a career offender with at least ten prior crimes of violence and a theft conviction. Additionally, trial counsel testified that the petitioner was a registered sex offender at the time of his arrest.

According to the petitioner's presentence report, he has nine prior convictions of aggravated robbery, a Class B felony, one prior conviction of aggravated rape, a Class A felony, one prior conviction of aggravated sexual battery, a Class B felony, and one prior conviction of theft over $500, a Class E felony. On appeal, the petitioner contends that his prior convictions do not contain an element of actual bodily injury or serious bodily injury and, therefore, should have merged under the twenty-four-hour merger rule. This Court has repeatedly held that "robbery, and by extension aggravated robbery, contains an element that the defendant cause or threaten to cause bodily injury." *State v. Hughes*, No. M2015-01688-CCA-R3-CD, 2016 WL 6956804, at *4 (Tenn. Crim. App. Nov. 29, 2016), *perm. app. denied* (Tenn. Feb. 16, 2017); *see also State v. Middlebrook*, No. M2009-02276-

CCA-R3-CD, 2011 WL 198689, at *7 (Tenn. Crim. App. Jan. 11, 2011); *State v. Abdi*, No. M2009-01614-CCA-R3-CD, 2010 WL 2977892, at *6 (Tenn. Crim. App. July 29, 2010). On appeal, the petitioner, without citing to legal authority, argued the post-conviction court's finding that the trial court properly considered the petitioner's prior convictions was "not sound." The State argued that the post-conviction court correctly concluded that "[c]ounsel is not required to present frivolous or unfounded claims that are not supported by precedent, to provide effective assistance of counsel." We agree. Accordingly, the petitioner is not entitled to relief on this issue.

## Conclusion

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's judgment denying the petitioner post-conviction relief.

s/ J. ROSS DYER

J. ROSS DYER, JUDGE